**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| PEAR THERAPEUTICS, INC., *et al.*[1] | Case No. 23-10249 (____) |
| | (Joint Administration Requested) |
| Debtors. | |

**DECLARATION OF CHRISTOPHER GUIFFRE PURSUANT TO 28 U.S.C. §
1746 IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND
FIRST DAY PLEADINGS**

I, Christopher Guiffre, of full age, hereby declare as follows:

1.      I am the Chief Financial Officer and Chief Operating Officer of Pear Therapeutics,

Inc. ("Pear Holdings") and Pear Therapeutics (US), Inc. ("Pear US" and collectively with Pear

Holdings, "Pear" or the "Company"), the above captioned debtors and debtors-in-possession (the

"Debtors").  I have worked at Pear for more than five (5) years.  In these capacities, I am familiar

with the Debtors' business, day-to-day operations and financial affairs.

2.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under chapter 11 (the "Chapter 11 Cases") of title 11 of the United States Code,

11 U.S.C. §§ 101, *et seq.* (as amended or modified, the "Bankruptcy Code"), in the United States

Bankruptcy Court for the District of Delaware (the "Court") and filed various motions described

herein requesting certain relief in connection with the Chapter 11 Cases (collectively, the "First

Day Motions").  I submit this declaration (the "Declaration") in support of the Chapter 11 Cases

and the First Day Motions.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Pear Therapeutics, Inc. (3092) and Pear Therapeutics (US), Inc. (7074).  The Debtors' corporate headquarters are located at 200 State Street, 13th Fl., Boston, MA 02109.

3.      Except as otherwise indicated herein, all statements set forth in the Declaration are based upon (a) my personal knowledge gained in my capacity as an officer of Pear; (b) information provided to me by other members of Pear's management team, including those under my supervision; (c) my review of relevant documents; and/or (d) my experience and knowledge of Pear's operations and financial affairs.  If called upon to testify, I could and would testify to the facts set forth herein.

4.      Part I of the Declaration describes the Company's business, Part II describes the circumstances giving rise to the commencement of the Chapter 11 Cases, Part III describes the Debtors' proposed course for the Chapter 11 Cases, and Part IV sets forth certain facts in support of the First Day Pleadings.

**I.**

**OVERVIEW OF THE DEBTORS' BUSINESS**

*Business Operations Overview and Corporate Structure*

5.      Pear is a commercial-stage healthcare company pioneering a new class of software-based medicines, sometimes referred to as Prescription Digital Therapeutics ("PDTs"), which use software to treat diseases directly.  The Debtors are both corporations organized under the laws of the State of Delaware.  Pear Holdings was formerly known as Thimble Point Acquisition Corp. ("THMA"), a corporation organized under the laws of the State of Delaware.  Pear US was formerly known as Pear Therapeutics, Inc. and was incorporated on August 14, 2013.

6.      On December 3, 2021, Pear consummated a business combination (the "Business Combination") pursuant to the terms of a certain Business Combination Agreement (the "Business Combination Agreement"), entered into by and among Pear Holdings, Pear US, and Oz Merger Sub, Inc. ("Merger Sub").  Merger Sub was a corporation organized under the laws of the State of

Delaware and a wholly-owned subsidiary of THMA.  Under the terms of the Business Combination Agreement, Merger Sub merged with and into Pear US, with Pear US surviving as the wholly-owned subsidiary of Pear Holdings.  After the closing of the Business Combination, THMA changed its name to Pear Therapeutics, Inc. (otherwise referred to as Pear Holdings herein).

7.      The Debtors operate through Pear US, which wholly owns one non-debtor, non-operating subsidiary, Pear Therapeutics Securities Corporation ("Pear MSC"), a Massachusetts tax-advantaged subsidiary established for the sole purpose of receiving and maintaining proceeds from the Debtors' capital raising activities.

***Prescription Digital Therapeutics***

8.      Prior to the Petition Date, Pear pursued the development and commercialization of PDTs, which are software applications authorized by the U.S. Food and Drug Administration (the "FDA") that are intended to treat disease.  PDTs are designed to be prescribed by clinicians and used by patients to improve clinical outcomes as part of a patient's care, similar to FDA-approved medications and medical devices.  PDTs are authorized to deliver evidence-based mechanisms-of-action, such as cognitive behavioral therapy, contingency management, and exposure therapy, that the patient engages with on their mobile device and may be used alone or in collaboration with medications.  PDTs are designed to expand access and convenience for patients, improve reach for clinicians and reduce cost for payors by reducing and/or augmenting human intervention, providing for more efficient care, and by ideally improving clinical outcomes.

9.      Pear has three (3) marketed products: (a) reSET®, (b) reSET-O®, and (c) Somryst®.  The Company collects clinical and real world data that demonstrate the efficacy, safety and value of Pear's products to patients, health care providers and payors.

10.     reSET®, the first PDT to receive authorization from the FDA to improve disease outcomes, is a 90-day PDT for Substance Use Disorder (SUD) intended to provide cognitive behavioral therapy (CBT), as an adjunct to a contingency management system, for patients 18 years or older who are currently enrolled in outpatient treatment under the supervision of a clinician.  An associated dashboard for clinicians and other health care providers can be used as part of treatment. The dashboard displays information about patients' use of reSET®, including lessons completed, patient-reported substance use, patient-reported cravings and triggers, compliance rewards and in-clinic data inputs such as urine drug screen results.

11.     reSET-O®, the first PDT to receive Breakthrough Designation and authorized by the FDA in December 2018, is an 84-day PDT for Opioid Use Disorder (OUD) intended to increase retention of patients in outpatient treatment by providing cognitive behavioral therapy (CBT), as an adjunct to outpatient treatment that includes transmucosal buprenorphine and contingency management, for patients 18 years or older who are currently under the supervision of a clinician. An associated dashboard for clinicians and other health care providers can be used as part of treatment.  The dashboard displays information about patients' use of reSET-O®, including lessons completed, patient-reported substance use, patient-reported cravings and triggers, patient-reported medication use, compliance rewards and in-clinic data inputs such as urine drug screen results.

12.     Somryst® is indicated for the treatment of chronic insomnia.  It is the only software-based, FDA-authorized and guideline-recommended treatment for chronic insomnia in adults over 22 years of age.  Somryst® is a nine-week prescription-only treatment.

13.     In addition to Pear's three (3) marketed products, Pear has developed a pipeline of PDT candidates for a variety of additional indications across psychiatry, neurology, and outside-

of-central nervous system therapeutic areas.  The product candidates in Pear's pipeline are intended to deliver various forms of standardized and disease-specific behavioral treatments such as cognitive behavioral therapy, behavioral activation, exposure therapy, and/or cognitive restructuring.  In July 2022, Pear paused investment in its product development pipeline to focus investment in reSET® and reSET-O®.

### Intellectual Property

14.    Pear maintains various intellectual property regimes, including patents, copyrights and trademarks, to preserve proprietary technology, inventions and improvements that are commercially important to the development of its business.  In addition, Pear possesses the rights to use and exploit technologies disclosed in issued and pending patents and other therapeutic content under licenses and/or assignment agreements with other entities.

### Patents

15.    The Debtors exclusively own eleven (11) patent families directed to a variety of different aspects related to PTDs, including families that are directed towards (i) data security, (ii) optimization of buprenorphine induction, (iii) treatment of migraines, (iv) treatment of depressive symptoms associated with multiple sclerosis, (v) clinical curation of crowdsourced data, (vi) visualizing and modifying treatment of a patient utilizing digital therapeutics, (vii) generating and administering digital therapeutic placebo and shams and (viii) display screens with an animated graphical user interface.  The Debtors also jointly own two (2) patent families directed to a variety of different aspects related to digital therapeutics, including families that are directed towards the treatment of depressive symptoms and disorders utilizing digital therapies and treatment utilizing antipsychotics in combination with digital therapies.

16.     Pear is the exclusive licensee within a broad field of use to a portfolio of patents directed to combinational drug and prescription digital therapy treatments.

**Copyrights**

17.     In addition to their patent portfolio, the Debtors hold copyrights in each of their PDTs and have registered copyrights in the source code for each of their commercial products with the U.S. Copyright Office.

**Trademarks**

18.     The Debtors have seven (7) registered trademarks covering goods and services with the U.S. Patent and Trademark Office (the "USPTO"), including federally registered trademarks PEAR THERAPEUTICS, the Pear logo, RESET, RESET-O, and SOMRYST.  Certain of the RESET and RESET-O trademark applications and registrations are the subject of ongoing opposition and cancellation proceedings, respectively, and decisions in the Debtors' favor in prior opposition and cancellation proceedings related to other RESET and RESET-O trademark applications and registrations, respectively, are the subject of an appeal pending in a federal district court in California.

***The Debtors' Cash***

19.     Prior to the Petition Date, and in the ordinary course of business, the Debtors maintained (i) six (6) bank accounts at Silicon Valley Bridge Bank, N.A. ("SVB"), a division of First Citizens Bank & Trust Company, Raleigh, North Carolina ("First Citizens"); and (ii) two (2) bank accounts at US Bank (collectively, the "Bank Accounts").  The Debtors maintained the Bank Accounts to manage the funds they hold to operate their business.  The Debtors also maintained one (1) money market account at SVB and one (1) bank account at Citibank, both of which were closed by the Debtors in March 2023.  The Bank Accounts are part of a carefully constructed cash

management system that ensures the Debtors' ability to efficiently monitor and control their cash position and disburse funds to satisfy their obligations.

20.     As of the Petition Date, substantially all of the Debtors' cash is held in the following accounts: (i) approximately $4.5 million in a sweep account (the "Sweep Account") held by Pear US in BlackRock Liquidity Fed Fund (CUSIP) 9248U445 with BlackRock and accessed through SVB (3804); and (ii) approximately $0.7 million in a payroll account (the "Payroll Account") held by Pear US at SVB (2835).  In addition, the Debtors maintain two (2) operating accounts: (i) an operating account held by Pear US at SVB (5934) (the "US Operating Account"), and (ii) an operating account held by Pear Holdings at SVB (0767) (together with the US Operating Account, the "Operating Accounts").  The Operating Accounts are used for all daily banking activities, including to pay vendors.  The US Operating Account is a zero balance account and the net debits and credits against the account are settled against funds held in the Sweep Account.

21.     The Debtors' enterprise resource planning system is integrated into SVB's Transact Global Getaway payment management system to process the majority of the Debtors' disbursements securely and provide certain features to protect the accounts against fraudulent payments.  Disbursements are typically made in the form of ACH payments, credit card payments and wire transfers.  Checks can be disbursed from the Operating Accounts, however SVB requires positive pay information to be provided before SVB will honor the presented checks.

22.     During the Chapter 11 Cases, the Debtors will be funded with cash from the Sweep Account.

23.     The Debtors also maintain a deposit account (2502), which holds the funds withheld from the Debtors' employees' paychecks and are used to fund the Debtors' employee flexible

spending accounts, including ERISA governed healthcare accounts, dependent care accounts and transit and parking reimbursement accounts.

24.     The Payroll Account (2835) holds the funds for the Debtors' current and upcoming employee payroll payments, including the associated taxes.

25.     The Debtors also maintain a collateral money market account at SVB (7522) with a fixed balance of $411,231.94 as collateral for a standby letter of credit agreement that serves as the security deposit between the Debtors and their landlord for their San Francisco, California lease.

26.     The Debtors perform a reconciliation of all deposits and debits in their cash management system which were historically performed daily.  The Debtors also make book entries as necessary for each transfer between the Bank Accounts.  The Debtors believe that their cash management system is similar to those commonly employed by corporate enterprises comparable to the Debtors in size and complexity.

27.     As further described below, while Perceptive Credit Holdings III, LP ("Perceptive") held a lien in the Bank Accounts prior to the Petition Date, that lien was released in connection with a settlement amongst the Debtors, Pear MSC and Perceptive.  Neither Perceptive nor any other person or entity held a lien in the accounts of Pear MSC, although Perceptive had a pledge of the shares of Pear MSC.

### *Secured Debt and the Perceptive Settlement*

28.     On June 30, 2020, Pear US (by its former name) entered into a certain Credit Agreement and Guaranty with Perceptive, as administrative agent (in such capacity, the "Administrative Agent") and lender, which was amended and restated pursuant to that certain Amended and Restated Credit Agreement and Guaranty, among Pear Holdings, Pear US as the

borrower and Perceptive as lender and the Administrative Agent, dated as of March 25, 2022 (as amended as of January 13, 2023 and as subsequently amended, supplemented or otherwise modified, from time to time, the "Perceptive Credit Agreement").   The Perceptive Credit Agreement provided a $30.0 million term loan, secured by a first priority lien on substantially all of the assets of Pear Holdings and Pear US, including all of the equity interests of Pear US in Pear MSC (the "Prepetition Perceptive Lien"), pursuant to a certain Security Agreement entered into with Perceptive as of June 30, 2020, which was amended and restated pursuant to that certain Amended and Restated Security Agreement among Pear Holdings, Pear US and the Administrative Agent as of March 25, 2022 (as subsequently amended, supplemented or otherwise modified, from time to time, the "Perceptive Security Agreement," and together with the other Loan Documents (as defined in the Perceptive Credit Agreement), the "Perceptive Loan Documents").   Pear Holdings guaranteed the obligations of Pear US under the Perceptive Loan Documents.  Pear MSC was not an obligor or guarantor of the obligations under the Perceptive Loan Documents.  The term loan of $30.0 million (the "Loan") was advanced by Perceptive on June 30, 2020 and remained outstanding as of April 6, 2023.

29.    The Loan was due on June 30, 2025 (the "Maturity Date") and as of March 31, 2023, the floating interest rate was 15.1% per annum.   Upon default, the interest rate would increase upon demand by Perceptive by 4.0% per annum.  Pear was required to make monthly payments of accrued interest and, as of May 31, 2024, monthly payments of principal equal to 3.0% of the aggregate original principal amount of the Loan until the Maturity Date.  As of the Petition Date, the monthly interest payments were approximately $400,000.

30.    The Perceptive Credit Agreement required, among other things, (i) Pear to maintain a minimum aggregate cash balance of $5.0 million in accounts subject to a control agreement in

favor of Perceptive and (ii) specified trailing 12-month period revenue requirements.  Pear was not in compliance with the revenue covenant as of December 31, 2022 and as of March 31, 2023, but Perceptive granted a waiver for the fiscal quarter ended December 31, 2022 and the fiscal quarter ending March 31, 2023.  As of the Petition Date, Pear was unlikely to be able to satisfy the revenue covenant for future quarters.  The Perceptive Credit Agreement contains various other covenants that limit the Company's ability to engage in specified types of transactions.

31.    The Prepetition Perceptive Lien was perfected by (i) a UCC-1 filing with the Secretary of the State of Delaware dated June 20, 2020 against Pear Therapeutics, Inc. as debtor, which was amended on December 28, 2021 to change the debtor's name to Pear US and (ii) a UCC-1 filing with the Secretary of the State of Delaware dated March 29, 2022 against Pear Holdings.  The Administrative Agent also recorded liens on the Debtors' patents and trademarks with the USPTO and on the Debtors' copyrights with the U.S. Copyright Office.  On June 30, 2020, Perceptive perfected its lien in the cash in the Bank Accounts by executing a deposit account control agreement among Pear US, Perceptive and SVB, in favor of Perceptive.  On June 26, 2020, Pear MSC, the Administrative Agent and SVB executed a certain securities account control agreement in favor of Perceptive covering an asset management account of Pear MSC (1594).  The Debtors asserted that such agreement contained an error as to Pear MSC being a party and as to the inclusion of Pear MSC's asset management account (1594), because Pear MSC was not an obligor under the Perceptive Credit Agreement and had not granted a lien in favor of the Administrative Agent on any of its assets in the Perceptive Loan Documents.

32.    On or about March 11 and 12, 2023, upon the receivership of SVB by the Federal Deposit Insurance Corporation (the "FDIC"), the Debtors agreed to the Administrative Agent's request to establish new banking relationships and control agreements.

33.     In March and April 2023, after identifying and discussing with the Administrative Agent a number of disputes with respect to, among other things, the Perceptive Loan Documents, the Loan, the Prepetition Perceive Lien, the control agreements held at SVB and new banking accounts to be established, the Administrative Agent, Perceptive, Pear MSC and the Debtors resolved the outstanding balance under the Perceptive Loan Documents and all actual or potential claims among them related to the Perceptive Loan Documents and Obligations (as defined therein) thereunder.  Pursuant to that certain Settlement Agreement, dated as of April 6, 2023, by and among the Administrative Agent, Perceptive as the sole lender, Pear Holdings, Pear US and Pear MSC (the "Settlement Agreement"), in full complete and final satisfaction of any and all Obligations under the Perceptive Loan Documents, the parties agreed that, among other things:[2]

a.     Pear was lawfully indebted to the Secured Parties in the amount of not less than $33,838,500 (in principal, interest, and other amounts) on account of the Obligations and the Administrative Agent, for the benefit of the Secured Parties, held a valid and perfected first-priority Lien on and security interest in substantially all of the assets of Pear (subject only to Permitted Liens) which included all Equity Interests (as defined in the Perceptive Security Agreement) issued by Pear MSC and held by Pear US and all products and proceeds thereof (the "Pear MSC Equity Interests");

b.     Pear MSC would make a distribution to the Administrative Agent (for the benefit of the Secured Parties) in an amount equal to $18,660,000.00 in cash on account of the Pear MSC Equity Interests (the "Pear MSC Distribution"), which Pear MSC Distribution amount credits Pear for the monthly payment of approximately $405,000.00 made to Perceptive on March 31, 2023.  To the extent that Pear MSC held cash in an amount more than the amount of the Pear MSC Distribution, the Administrative Agent shall cause and direct Pear MSC to make a distribution to Pear US in an amount equal to any such excess (the "Pear MSC Excess Distribution"), which Pear MSC Excess Distribution is estimated, as of the Petition Date, to be in the amount of approximately $635,000.00;

c.     Pear would sell, transfer and assign to the Administrative Agent for the benefit of the Secured Parties, a refund claim held by Pear against the United States Treasury

---

[2] To the extent that there is any discrepancy in the summary provided herein with the terms of the Settlement Agreement, the Settlement Agreement governs.

/ Internal Revenue Service (the "IRS"), estimated as of the Petition Date to be in an amount up to $4.7 million (the "Federal Tax Refund"); and

d.  The Administrative Agent, on behalf of the lender, would have an unsecured claim against each of Pear Holdings and Pear US, which are jointly and severally liable for such unsecured claim, on account of Obligations not satisfied by the Pear MSC Distribution and the Federal Tax Refund, up to a maximum total claim amount of $10,400,000 (the "Residual Claim Amount"), which claim shall rank *pari passu* in right of payment with all other nonpriority general unsecured claims against each of Pear Holdings and Pear US (the "Residual Claim"). The Residual Claim Amount represents a discount to the total amount that Perceptive may otherwise have claimed against Pear as of the Petition Date and does not include post-petition interest that Perceive might have claimed against Pear.

34.     As of the Petition Date, the Settlement Agreement is effective, and the Administrative Agent on behalf of the lenders is no longer a secured creditor over all of the Debtors' assets (but remains a secured creditor in respect of the Federal Tax Refund). The only remaining obligations to Perceptive are on account of the assigned Federal Tax Refund and the unsecured Residual Claim. The parties have exchanged releases as more fully set forth in the Settlement Agreement.

### *Leases*

35.     The Debtors are headquartered in Boston, Massachusetts. The Debtors lease office space in three (3) cities: (a) Boston, Massachusetts; (b) San Francisco, California; and (c) Raleigh, North Carolina.

36.     Pear US leases approximately 19,000 square feet in premises at 200 State Street, 13th Floor, Boston, MA 02109 (the "Boston Premises"). The lease for the Boston Premises is set to expire on June 1, 2028 and Pear US possesses the right to extend the lease term for an additional five-year period. The monthly base rent obligation for the Boston Premises in 2023 is $106,869.39 plus fees associated with the common area that are billed in arrears. Pear US has subleased 7,218 square feet of the Boston Premises with a stated term of one (1) year and renewal options for two additional years in one-year increments.

37.     Pear US leases approximately 17,000 square feet in premises at 201 Mission Street, Suite 1450, San Francisco, CA 94105 (the "San Francisco Premises").  The lease for the San Francisco Premises is set to expire on July 31, 2025.  The monthly base and additional rent obligations for the San Francisco Premises in 2023 is $128,422.98, inclusive of $14,744.53 of estimated common area fees and real estate taxes ("Additional Rent") (final amount of common area and real estate taxes adjusted at the end of the calendar year based on actuals).  As of the Petition Date, the amounts due for the prior year Additional Rent for the Debtors' prorated portion of the operating expenses and taxes related to calendar year 2022 are $23,573.56 and remain due and payable to the landlord for the San Francisco Premises, CA-Mission Street Limited Partnership (the "San Francisco Landlord").  As of the Petition Date, as security for the lease of the San Francisco Premises, Pear had $0.4 million in a letter of credit outstanding (the "SF Letter of Credit").  Due to the receivership of SVB by the FDIC and subsequent transfer of assets and obligations to a "bridge bank," the San Francisco Landlord demanded that Pear issue a replacement letter of credit or provide a cash security deposit in the face amount of the existing SF Letter of Credit by April 21, 2023.  By letter dated April 3, the San Francisco Landlord sent a notification of non-payment of base rent and Additional Rent.  As of the Petition Date, Pear US has not taken any further action with respect to replacing the SF Letter of Credit, providing a cash security deposit to the San Francisco Landlord or paying April's base rent and Additional Rent.

38.     Pear US leases premises approximately 7,700 square feet at 2300 Rexwoods Drive, Suite 250, Raleigh, NC 27607 (the "Raleigh Premises").  The lease for the Raleigh Premises is set to expire on May 31, 2026 and Pear US possesses the right to extend the lease for an additional five-year period.  The monthly base rent obligation for the Raleigh Premises in 2023 is $18,270.29 plus common area and taxes of approximately $150.00.   Effective January 6, 2023, Pear US

subleased the entirety of the Raleigh Premises with a stated term of one year and a renewal option for an additional one-year period, with a 3% rate increase.

39.    The Debtors maintain equipment leases in their ordinary course of business.

***Unsecured Debt***

40.    As of the Petition Date, Pear US estimates that its unsecured debt totals approximately $22,029,029.72 million, consisting of contractual obligations, trade debt and the Residual Claim.  As of the Petition Date, Pear Holdings estimates that its unsecured debt totals approximately $ 10,472,086 million, consisting of contractual obligations, trade debt and the Residual Claim.

***Company Credit Cards***

41.    The Debtors have twenty-one (21) credit cards with SVB with a combined total credit limit of $2,000,000, of which a sublimit of $370,000 is currently issued and available under the existing cards, and which are billed monthly under two (2) statements.  The Debtors' credit cards are set forth in more detail in Exhibit D to the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (II) Authorizing the Continued Use of Existing Cash Management System, and (III) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(b)*.  The Debtors use the credit cards to pay certain automatic recurring payments, one-off vendor payments, and other general business expenses incurred.  The Debtors make an automatic monthly payment on the credit credits for the full amount of the statement balance.  The Debtors typically charge approximately $200,000 per month on their credit cards.  As of the Petition Date, the Debtors estimate that they have $1,048.28 of unpaid obligations on their credit cards.

42.     The Debtors plan to discontinue their use and terminate nineteen (19) of their credit cards shortly after the Petition Date, leaving only two (2) of their credit cards in operation.

**Business Forms and Checks**

43.     The Debtors use checks with Pear US's name printed thereon in the ordinary course of business.  The Debtors also maintain pre-printed correspondence and business forms, such as letterhead, envelopes, promotional materials and internal administrative forms.

*Litigation*

44.     On December 5, 2022, Dan Peterson, a former sales person, filed a complaint against the Company in the United States District Court for the Northern District of Texas (*Peterson v. Pear Therapeutics, Inc.*; Case No. 1:22-cv-00187-C) (the "Peterson Litigation").  In his complaint, Mr. Peterson alleges he was terminated in retaliation for raising compliance issues while he was employed by Pear US, similar to allegations he has made against two of his prior employers.  Pear US terminated Mr. Peterson for cause after it learned he was employed by another employer in a full-time sales position while simultaneously being employed by Pear US.  Pear denies the allegations and intended to vigorously defend itself against Mr. Peterson, however, as a result of the bankruptcy filing, it is my understanding that the Peterson Litigation is now stayed.

45.     As referenced above, Masimo Corporation ("Masimo") initiated trademark opposition proceedings against three (3) of Pear US's pending federal trademark applications to register the reSET and reSET-O trademarks with the USPTO on September 10, 2019.  On March 18, 2020, Masimo filed trademark cancellation proceedings against three of Pear US's reSET and reSET-O trademark registrations with the USPTO.  Opposition and cancellation proceedings are both heard by the USPTO's Trademark Trial and Appeal Board (the "TTAB").  The TTAB decided both proceedings in the Company's favor in decisions issued in June 2022.  In August 2022,

Masimo appealed these decisions in the United States District Court for the Northern District of California (Case No. ND Cal Appeal: 4:22-cv-04780-JST).  Prior to the filing of its chapter 11 petition, Pear US had been vigorously defending against Masimo's action.  On January 19, 2023, Masimo initiated a trademark opposition proceeding against Pear US's pending federal trademark application to register reSET-A (Second Notice of Opposition Docket No.: MASIMOT1001M) and filed a trademark cancellation proceeding against another of Pear US's reSET trademark registrations with the TTAB (Second Petition for Cancellation, Docket No.: MASIMOT1000N). As a result of the filing of this bankruptcy, it is my understanding that this litigation is also subject to the automatic stay provisions of section 362 of the Bankruptcy Code.

### *Common Stock, Warrants, and Related Capital Raising Activity*

46.    As of April 5, 2023, Pear Holdings is a publicly traded company with (i) approximately 142,754,680 shares of class A common stock, par value $0.0001 per share, outstanding and trading on the Nasdaq Global Market under the symbol "PEAR"; and (ii) approximately 14,213,267 warrants, each exercisable for one share of class A common stock for $11.50 per share, outstanding and trading on the Nasdaq Global Market under the symbol "PEARW."

47.    As of March 31, 2023, there were approximately 168 shareholders of record of Pear Holdings' class A common stock and two warrant holders of record of Pear Holdings' warrants. The number of record holders is based upon the actual number of holders registered on Pear Holdings' books as of March 31, 2023 and does not include holders of shares in street name or persons, partnerships, associations, corporations or other entities identified in security position listings maintained by depository trust companies.  The Debtors' transfer agent is Continental Stock Transfer & Trust Company.

48.     On January 3, 2023, Pear Holdings entered into a certain At The Market Offering Agreement (the "ATM") with H.C. Wainwright & Co., LLC ("H.C. Wainwright") and Virtu Americas LLC, pursuant to which Pear Holdings offered to sell shares of its class A common stock for aggregate gross proceeds up to $150 million, subject to the effectiveness of Pear Holdings' registration statement on Form S-3 filed with the U.S. Securities and Exchange Commission on January 3, 2023.  The Company raised less than $1 million through the ATM, and it was unable to complete an anticipated public offering with H.C. Wainwright.

49.     Pear's source of funding had been capital raising activities in private and public equity markets and through the Loan.  As of March 31, 2023, the Company had an accumulated deficit in excess of $323.7 million.

## II.

## EVENTS LEADING TO THE CHAPTER 11 CASES

50.     Through the Business Combination, Pear Holdings went public in December 2021 to gain access to the capital markets.  As described in more detail in *supra* ¶ 6, Pear Holdings was taken public via a special purpose acquisition company transaction, or a "de SPAC" transaction. The Business Combination only raised $175 million, which was less than half of the expected $400 million in capital raising.

51.     Throughout 2022 and the first quarter of 2023, the Debtors explored a variety of financing alternatives without success.  The Company planned to raise capital in Q1 of 2023 after its S-3 Registration Statement was declared effective, but was unable to do so.

### *Workforce Reductions*

52.     The Debtors are unable to continue the commercialization of their products and development of their pipeline of product candidates due to financial constraints.  Since going

public in December 2021, the Debtors have implemented cost-cutting measures, including three (3) reductions in force, reducing investment in their pipeline candidates, discovery programs and business development, but they have been unsuccessful in raising the capital necessary to operate the business any further.  The Company intends to sell its assets in the Chapter 11 Cases.

53.     On July 25, 2022, Pear restructured its operations to narrow its near-term business focus and reduce its workforce.  Pear incurred a charge of $0.9 million primarily associated with the severance and health insurance expenses related to a 25-person reduction in force (representing an approximate 9% reduction of the then-full-time workforce).   In connection with the restructuring, the Company also reduced the cost of its pipeline candidates, discovery programs, business development and dual platform in an effort to prioritize its commercialized products.

54.     On November 14, 2022, Pear announced a second reduction in workforce, further reducing its headcount by approximately 59 employees (representing an approximate 22% reduction of the then-full-time workforce).  Pear recorded $2.5 million in severance charges in connection with its second reduction in workforce, which consisted of severance payments, employee benefits and related costs.

55.     On or about April 6, 2023, the Company notified approximately 177 employees, almost all of its workforce, that they were part of a further reduction in force.

56.     As a result of the previously noted workforce reductions and ongoing workforce attrition, the Debtors employ fifteen (15) full-time employees (the "Employees") on a salaried basis, and one (1) consultant (collectively with the Employees, the "Transition Team") on an hourly basis, as of the Petition Date.  The Debtors' Transition Team works remotely or works out of the Debtors' corporate headquarters in Boston, Massachusetts.  The Debtors intend to retain sufficient staffing through the Transition Team to allow current patients to utilize the Debtors'

products for the duration of their current fill of their prescription (without refills), complete their responsibilities in the Chapter 11 Cases, completing one or more sales of the Debtors' assets and confirming a chapter 11 plan.

57.     Prior to the Petition Date, the Debtors' average weekly payroll obligation was approximately $746,000.00.  As a result of the latest reduction in force, the Debtors estimate that their payroll obligation will be approximately $295,000.00 for the first four weeks of the Chapter 11 Cases.  As of the Petition Date, the Debtors estimate that they owe approximately $75,000 to the Employees for prepetition wage obligations.

58.     As of March 28, 2023, approximately $455,000.00 of restructuring bonuses and $26,163.08 in employer taxes were approved by the Board of Directors and were paid to approximately fourteen (14) of the Employees who the Debtors deemed necessary for their restructuring efforts, including preparation of the Chapter 11 Cases, and valuable for a potential sale of the assets of the Debtor.  The restructuring bonuses and employer taxes took into consideration the replacement cost if consultants were hired to perform the Employees' services.

### Deteriorating Public Market Conditions

59.     The restructuring efforts were motivated by Pear's belief that the best way to raise more capital was to grow revenue via continued investment in the commercialization of Pear's three marketed products: (a) reSET®, (b) reSET-O®, and (c) Somryst®.  *See supra* at ¶¶ 9-12.

60.     Pear recognized that it was reliant upon improved market conditions to facilitate the capital raising necessary to maintain its operations.  Pear sought to rekindle its capital raising capabilities through use of the ATM starting in January 2023 and a public offering in February 2023.  Unfortunately, the Company raised less than $1 million from the ATM, and it was unable

to complete a public offering in the first quarter.  As of the Petition Date, the Debtors have no reasonable prospects of raising capital.

### *Limited Revenue*

61.     In addition to capital raising issues, Pear expected its revenues to continue to grow after going public.  Revenue grew in the first, second, and third quarters of 2022, but revenue in the fourth quarter of 2022 was down from the prior quarter and revenue in Q1 2023 was down further.

### *Impact of the Collapse of the Debtors' Depositary Bank, SVB*

62.     Compounding issues further, Pear, through the Operating Accounts, the Sweep Account and Pear MSC's accounts, maintained most of its cash at SVB prior to the run on the bank on March 9, 2022 and the bank's collapse on March 10, 2022.  This caused significant distraction to the executive and leadership teams at Pear as they tried to open new accounts, evaluate options in the absence of access to cash and consider strategic alternatives.  The FDIC's receivership of SVB prompted Pear's discussions with Perceptive as to issues over demand control agreements and the financial creditworthiness of Pear, ultimately leading to the Settlement Agreement.

### *Sale & Marketing Process*

63.     In February 2023, Pear Holdings retained MTS Health Partners, L.P. ("MTS"), a financial advisory and investment banking firm, to explore strategic alternatives, as memorialized by that certain engagement letter between the Debtors and MTS, dated as of March 4, 2023 and amended as of March 28, 2023 (the "Engagement Agreement").  On or about February 22, 2023, MTS and the Debtors executed a nondisclosure agreement and by March 6, 2023, MTS launched its marketing of the sale of Pear and the sale of the Debtors' assets.  On March 17, 2023, Pear Holdings announced via press release and in an SEC Form 8-K Filing that it engaged MTS to assist

with the exploration of strategic alternatives that may include, but are not limited to, the sale of all or substantially all of the Debtors' assets and/or intellectual property, a strategic merger, licensing, change of control transaction or other strategic transactions and/or seeking additional financing.

64.     MTS coordinated a formal bidding process for four weeks in March.  MTS prepared and distributed teasers and presentations and organized a virtual data room of confidential information.  MTS, along with Pear's management, conducted management presentations with potential bidders.  MTS pursued over 140 different institutional, strategic and financial potential purchasers.   Potential strategic purchasers included pharmaceutical companies, health care insurance payors, health care providers, public technology companies, venture capital and private equity backed health and medical technology companies, pharmacies, and others.  MTS also conducted outreach with parties that responded to Pear Holdings' press release on March 17, 2023.

65.     MTS had established a prepetition bid deadline of March 31, 2023.  Over 90 parties engaged or responded to the strategic marketing process, approximately 24 parties executed or are in the process of executing confidentiality agreements and three parties submitted non-binding offers.

66.     After considering all available options, the Debtors ultimately determined that seeking protection under chapter 11 of the Bankruptcy Code and focusing their efforts on the marketing and sale of their assets and distribution of proceeds was in the best interests of the Debtors and their stakeholders.  To that end, the Debtors intend to proceed with a robust Court-supervised bidding and auction process that will expand and build upon the extensive prepetition process overseen by MTS, including by contacting potential purchasers that may be interested in only certain products, intellectual property or other assets.

67.    The Engagement Agreement was amended as of March 28, 2023 to retain MTS as investment banker during the Chapter 11 Cases to lead a refinancing, restructuring and/or marketing process for the sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code (the "Sale").  In order to facilitate the Sale, on the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Orders: (A)(I) Approving Bid Procedures Relating to the Sale of Substantially All of the Debtors' Assets, (II) Approving Stalking Horse Bid Protections, (III) Scheduling a Hearing to Consider the Sale, (VI) Approving the Form and Manner of Notice of Sale by Auction, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief; and (B)(I) Authorizing the Sale of Certain Assets of the Debtors Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of all Liens, Claims, Encumbrances and Interests, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (the "Bid Procedures Motion"), which, among other things, details the Debtors' proposed bidding procedures and sale process (the "Bid Procedures"). Subject to the Court's approval, the Bid Procedures contemplate the following key process dates, designed to maximize value in light of the financial reality the Debtors are facing:

| Bid Procedures Hearing: | April 21, 2023, or such other date as the Court may determine |
| --- | --- |
| Bid Deadline: | May 1, 2023 |
| Auction: | May 3, 2023 |
| Deadline for Objections to Sale | May 5, 2023 |
| Sale Hearing: | May 8, 2023 (subject to the Court's availability) |

68.    Subject to approval of and pursuant to the Bid Procedures, MTS will continue to market the Debtors' assets with the assistance and based on the knowledge and experience of the

Debtors' continuing management.  The Debtors believe, in the exercise of their business judgment, that the proposed sale and auction structure will foster an open and competitive process and provide the best option to maximize value for all of their stakeholders.  Indeed, given that the Debtors have no realistic opportunity to obtain additional financing from public or private markets, the only alternative to the Sale would be conversion to Chapter 7 and liquidation.  In the Debtors' view, Chapter 7 liquidation would be value destructive and wasteful, as the Debtors would immediately lose any substantial value as they attempt to monetize their unique assets and distribute value to stakeholders.  The potential value of the Debtors' programs is derived from a sale to or investment by strategic investors.  The Debtors will endeavor post-petition to allow patients currently utilizing their products to have continued access to their products for the duration of the applicable current fill of their prescription, but refills will not be dispensed.

69.    As part of the First Day Motions, the Debtors are seeking expedited relief for the Bid Procedures Motion to be heard pursuant to the separately filed motion to shorten notice period as Pear has been fairly marketed for sale prepetition.  The Debtors are seeking expedited relief because they believe that they will suffer immediate and irreparable harm without the Court's authorization to immediately establish procedures for the purchase, sale, or other transfer of the Debtors' assets.

### III.

### PROPOSED COURSE OF THE CHAPTER 11 CASES

70.    The Debtors intend to pursue the Sale in chapter 11 to obtain maximum value for the benefit of all of their stakeholders.  The Debtors have access to unencumbered cash that will, based on their budget, provide it with sufficient liquidity to satisfy all administrative claims

accruing during the Sale process and the Chapter 11 Cases in full, and to wind down the Debtors'
estates after the completion of the Sale process.

71.     In order to achieve their goals in chapter 11, the Debtors seek the relief set forth in
the First Day Motions, as summarized below.

## IV.

## FACTS IN SUPPORT OF FIRST DAY MOTIONS[3]

72.     To minimize the adverse effects of the commencement of the Chapter 11 Cases on
the Debtors' ability to effectuate a timely and efficient restructuring process that will preserve and
maximize the value of the Debtors' estates, the Debtors have filed the following motions:

- *Motion of the Debtors for Order (I) Directing Joint Administration of Chapter 11 Cases Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and (II) Granting Related Relief;*

- *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, (C) Redact Certain Personal Identification Information, and (II) Granting Related Relief;*

- *Debtors' Application for Appointment of Stretto, Inc. as Claims and Noticing Agent;*

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Their Insurance Policies and (B) Pay All Obligations with Respect Thereto, (II) Modifying Automatic Stay, and (III) Granting Related Relief;*

- *Motion of the Debtors for Authorization to Pay Certain Prepetition Taxes and Related Obligations;*

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services; (II) Determining Adequate Assurance of Payment for Future Utility Services; (III) Establishing Procedures for Determining Adequate Assurance of Payment; and (IV) Granting Related Relief;*

- *Motion of the Debtors for Entry of an Order Authorizing the Debtors to Pay Prepetition Wages, Compensation, Employee Benefits and Other Associated Obligations;*

---

[3] Capitalized terms not defined within this Section IV shall have the meaning ascribed to such terms in the respective First Day Motions.

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (II) Authorizing the Continued Use of Existing Cash Management System, and (III) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(b)*;

- *Motion of the Debtor Pear Therapeutics, Inc. for Entry of an Order Modifying the Requirements for the List of Equity Security Holders and Modifying the Notice Requirements for Equity Security Holders*; and

- *Motion of the Debtors for Interim and Final Orders Pursuant to Sections 105(a), 362(a)(3), and 541 of the Bankruptcy Code and Bankruptcy Rule 3001 Establishing Notice and Hearing Procedures for Trading in the Debtors' Equity Securities to Preserve their Tax Attributes.*

73.     I have reviewed each of the First Day Motions, including any exhibits thereto, and the statements and facts set forth in each of the First Day Motions are true and correct to the best of my knowledge, information, and belief.  I hereby incorporate by reference each of the factual statements set forth in the First Day Motions.  The First Day Motions seek authority to, among other things, jointly administer the Chapter 11 Cases for procedural purpose only, honor employee-related wages and benefit obligations and ensure the continuation of the Debtors' cash management systems and other business operations without interruption.  I believe that the relief requested in the First Day Motions is necessary to prevent irreparable harm and to give the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors' stakeholders.

74.     The First Day Motions seek entry of an order (i) authorizing the Debtors to (a) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each debtor, (b) file a consolidated list of the Debtors' 30 largest unsecured creditors in lieu of submitting a separate list for each debtor, (c) redact certain personal identification information; and (ii) granting related relief.  Generally, the Debtors maintain computerized records on a consolidated basis.  The Debtors believe that segregating and converting those records to a debtor-specific creditor matrix format would be unnecessarily burdensome and result in duplicative mailings.  The Debtors further

believe that filing separate lists of each respective debtor's 20 largest creditors would be of limited utility and would likely result in duplication, given that the Debtors' significant creditors are likely to overlap.   The Debtors believe that their request to consolidate their list of creditors, in conjunction with their retention of a claims agent in the Chapter 11 Cases, will be sufficient to provide notice to all creditors and interested parties during the Chapter 11 Cases.

75.    Certain of the First Day Motions request authority to pay prepetition claims.  I understand that Bankruptcy Rule 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one (21) days following the filing of a chapter 11 petition, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm."   In light of this requirement, the Debtors have narrowly tailored their request for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

### *Taxes*

76.    The Debtors are required to pay taxes in certain jurisdictions.  Franchise and excise taxes, as they may be referred to in different jurisdictions, are generally assessed by state and local taxing authorities against the Debtors for the privilege of doing business within a particular jurisdiction.  Franchise and excise taxes may be a flat fee or may be based on net operating income, gross receipts or capital employed.  Certain jurisdictions will refuse to qualify a company to do business in that jurisdiction if franchise and excise taxes have not been paid.  Most jurisdictions assess franchise and excise taxes on an annual basis, in arrears, but some jurisdictions require estimated franchise and excise taxes to be remitted on a quarterly basis if the estimated franchise and excise taxes exceed a certain threshold.  Some jurisdictions assess both franchise and excise

taxes and income taxes, while others assess either franchise and excise taxes or income taxes, depending on which results in the higher tax.

77.     For the year ended December 31, 2021, the Debtors paid approximately $320,412.00 to taxing authorities for their tax obligations.  The Debtors estimate that there are approximately $178,000.00 in Taxes that have accrued as of the Petition Date which have not yet been paid.  The Debtors believe that the approximately $103,000.00 of accrued Taxes will become due on or about April 15, 2023.  Failure to pay the accrued Taxes may result in additional interest and penalties charged to the Debtors.  As of the Petition Date, the Debtors have made $0 in estimated tax payments to taxing authorities.

### *Employment Obligations*

78.     The Debtors retained Paylocity Holding Corporation ("Paylocity") to administer their payroll and the disbursements of payroll funds.  The Employees are paid by direct deposit, meaning there are no uncashed payroll checks outstanding.

79.     The Debtors estimate that they owe approximately $75,000 to the Employees for prepetition wage obligations as of the Petition Date.

### H-1B Workers

80.     Prior to the April 6, 2023 workforce reduction, the Debtors employed two non-US citizens who were temporarily living and working in the United States under H-1B visas sponsored by the Debtors (collectively, the "H-1B Workers").  Under applicable law, the Debtors are obligated to continue to pay the H-1B Workers their wages until the Debtors meet the requirements set forth in 20 C.F.R. § 655.731(c)(7)(ii), which includes the obligation that the Debtors provide the H-1B Workers with payment of return transportation home.

**Paid Time Off**

81.     As of February 6, 2023, the Debtors changed their policy for vacation time, other personal time off, and paid sick leave to a flexible time-off non-accrual policy.  Prior to the Petition Date, the Debtors had already paid out all accrued and unused paid time off to their employees.  As of the Petition Date, the Debtors do not owe any amounts to their former and current employees on account of accrued paid time off.

**Reimbursable Expenses & Parking**

82.     Prior to the Petition Date, the Debtors routinely reimbursed the Employees for certain business-related expenses incurred within the scope of their employment, including expenses for travel, transportation, and phone coverage ("Reimbursable Expenses").  As of the Petition Date, the Debtors estimate that they have $15,000.00 of outstanding prepetition Reimbursable Expenses.  The Debtors typically pay $86,000.00 per month in Reimbursable Expenses.

83.     The Debtors offer their Employees parking, which is usual and customary.  The Debtors believe that three (3) of the Employees will use this benefit for $535 per spot monthly, which total $1,605 monthly.

**Health Plans**

84.     The Debtors provide the Employees the opportunity to participate in medical, dental, mental health, vision, health reimbursement account, healthcare flexible spending account, commuter benefits program, short- and long-term disability insurance, life insurance, accidental death and dismemberment insurance and a 401(k) plan (collectively, the "Employee Benefit Plans") upon their first date of hire.  Consultants are not eligible to participate in the Employee Benefit Plans.

85.     The Debtors currently offer the Employees and their dependents medical benefits through a medical plan (the "Medical Plan") administered by Blue Cross Blue Shield of Massachusetts ("Blue Cross") and Kaiser Permanente ("Kaiser"), dental coverage through a plan (the "Dental Plan") administered by Blue Cross and vision coverage through a plan (the "Vision Plan," and together with the Medical Plan and the Dental Plan, the "Health Plans") administered by Vision Service Plan ("VSP").

86.     Following the April 6, 2023 workforce reduction, as described in further detail herein, the Debtors estimate that they will pay $422,541.59 per month in fixed premiums to Blue Cross, Kaiser, and VSP for coverage under the Health Plans, with approximately $26,000.00 relating to the Employees and the balance being premiums that will be paid but reimbursed by the employees who elect COBRA coverage.  As of the Petition Date, the Debtors estimate that they have no outstanding payments owed to Blue Cross, Kaiser, and VSP on account of the Health Plans.

87.     All of the Debtors' employees have the right under the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA") to elect to receive COBRA coverage, which extends the benefits of the Health Plans to which an employee was entitled immediately prior to a qualifying event, such as resignation, termination or death of the employee (for surviving dependents), for a specified period of eighteen (18) months.  Employees who elect to receive COBRA coverage are required to pay 100% of the elected premiums, along with an additional 2% administrative fee.  As of the Petition Date, five (5) former employees are utilizing COBRA, not including the employees who were recently terminated on April 6, 2023 and have not yet elected such coverage, if needed.

88.     The Debtors' COBRA program is administered by HRC Total Solutions, LLC ("HRC").  The Debtors estimate that they pay approximately $125 per month in fees plus a one-time fee of approximately $6,500 to HRC to administer the Debtors' COBRA program that has not been paid and due as of the Petition Date.  The Debtors are invoiced by HRC and then pay for COBRA administration every month, with each payment remitted at the start of the monthly period covered by the invoice.  As of the Petition Date, the Debtors estimate that they have $6,625.00 in payments owed for COBRA administration.

**Life and Disability Insurance Plans**

89.     The Debtors provide their employees life insurance with accidental death and dismemberment coverage (the "Life Insurance Program") administered by Sun Life and Health Insurance Company (U.S.) ("Sunlife").   Under the Life Insurance Program, upon death, an employee's beneficiary receives a multiple (2x) of his or her salary up to a $300,000 cap.

90.     The Debtors also provide their employees short-term disability insurance (the "Short-Term Disability Insurance Program") and long-term disability insurance (the "Long Term Disability Insurance Program" and collectively with the Short-Term Disability Insurance Program, the "Disability Insurance Program"). The Disability Insurance Program is also administered by Sunlife.   Under the Short-Term Disability Insurance Program, once it is determined that an employee is unable to work and qualifies for the Short-Term Disability Program benefits, the employee is paid sixty percent (60%) of his or her full salary, up to $2,500 per week, through normal payroll cycles, for up to thirteen (13) weeks.  If, at that time, the employee is still unable to work, the employee transitions to coverage under the Long-Term Disability Insurance Program.

91.     The Debtors pay 100% of the premiums for the Life Insurance Program and Disability Insurance Program.  As of the Petition Date, the Debtors' total cost per month for the

Life Insurance Program and the Disability Insurance Program is approximately $15,000.00, and the Debtors estimate that the amount due postpetition for the continued benefit of the employees is approximately $3,500.00.  The Debtors are invoiced by the respective insurers and then pay this expense every month, with each payment made prior to the start of the monthly period covered by the invoice.  As of the Petition Date, the Debtors estimate that they have no outstanding payments owed for premiums under the Life Insurance Program or the Disability Insurance Program.

**401(k) Plan**

92.     The Debtors maintain a 401(k) savings plan (the "401(k) Plan") for the benefit of the Employees, which is managed by Vanguard Group, Inc.  The 401(k) Plan generally provides for the deduction (subject to certain statutory limits) of compensation automatically from a participating employee's paycheck at his or her election.  As of the Petition Date, eleven (11) employees participate in the 401(k) Plan.  The monthly estimated amount withheld from the Employees to be deferred into the 401(k) Plan is approximately $1,475 in the aggregate every other week.

**Employer Taxes and Deductions**

93.     The Debtors routinely withhold from their employees' paychecks amounts that the Debtors are required to transmit to third parties, including withholdings for social security, Medicare and Medicaid, federal, state and local income taxes and unemployment insurance (collectively, the "Employer Taxes and Deductions").  Paylocity calculates the amounts of the necessary withholdings and disbursements, and the Debtors use Paylocity to remit the withholdings to the relevant taxing or other authorities.  The Debtors estimate their average weekly contribution for the Employer Taxes and Deductions is approximately $15,000.00.  As of the

Petition Date, the Debtors estimate that they have approximately $15,000 accrued but not yet remitted Employer Taxes and Deductions.

**Payroll Processing**

94.     The Debtors pay approximately $600.00 per payroll run for payroll processing and Employer Taxes and Deductions-related services provided by Paylocity.  Paylocity automatically deducts the cost of its services along with the funds necessary to cover payroll from the Debtors' accounts every pay period.  As of the Petition Date, the Debtors believe they have approximately $5,000 outstanding payments due to Paylocity for its services.

*Utilities*

95.     In connection with the operation of their businesses and management of their properties, the Debtors historically obtained water, sewer service, electricity, waste disposal, natural gas, and other similar services (collectively, the "Utility Services") from several utility providers or brokers.  Those utilities are set forth in more detail in Exhibit A to the *Motion of the Debtors for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services; (II) Determining Adequate Assurance of Payment for Future Utility Services; (III) Establishing Procedures for Determining Adequate Assurance of Payment; and (IV) Granting Related Relief.*  The Debtors obtain some of the Utility Services indirectly as obligations paid to their landlords under various lease agreements.

96.     The Debtors paid approximately $4,828.19 per month, on average, over the twelve-month period prior to the Petition Date, for the Utility Services.  The Debtors estimate that their cost for the Utility Services during the postpetition period will average approximately $1,300.00 per month (prior to any rejection of leases).  The Debtors intend to pay postpetition obligations for the Utility Services in a timely manner and propose to pay 50% of the average monthly costs for the Utility Services as adequate assurance deposits.

### *NOLs*

97.    As of the Petition Date, the Debtors have significant net operating loss carryforwards, some of which are subject to certain limitations set forth in the Internal Revenue Code of 1986 (the "IRC"), and other valuable tax attributes, such as capital losses, unrealized built-in losses and other tax and business credits (collectively, the "Tax Attributes").  The Debtors are unaware of the precise amount of the Tax Attributes that the Debtors have accrued from certain prepetition transactions.   For instance, the Debtors believe that they may have caused an "ownership change" (as that term is defined in Section 382 of the IRC) in connection with the Business Combination or in connection with the Debtors' stock issuances in 2016, 2017, 2018, 2019, 2020 and 2021.  The analysis determining whether these events did cause an ownership change is still ongoing.  While the value of the Tax Attributes is contingent upon the amount of the Debtors' taxable income that may be offset by the Tax Attributes before they expire, the Tax Attributes could translate into potential future tax savings for the Debtors.

### *Insurance Policies*

98.    The Debtors maintain various insurance policies providing coverage pertaining to, among others, commercial general liability, commercial property, automobile, crime, cyber, fiduciary, products and management liability, workers' compensation, director and officer liability and employment practices liability (collectively, the "Insurance Policies").   Those insurance policies are set forth in more detail in Exhibit C to the *Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Their Insurance Policies and (B) Pay all Obligations with Respect Thereto, (II) Modifying Automatic Stay, and (III) Granting Related Relief.*  Pear Holdings is the policy holder for the Insurance Policies, in each case, for the benefit of itself and its affiliates, except that Pear US is the policy holder for the Workers' Compensation

Policies and products liability policies for the benefit of itself and its affiliates. The Insurance Policies help limit the various risks associated with operating the Debtors' business and are essential to the continuing operation of the Debtors' business in the Chapter 11 Cases. Some of the Insurance Policies are required by regulations, laws and contracts that govern the Debtors' commercial activities. The Debtors believe that the Insurance Policies provide coverage that is typical in scope and amount for similarly-situated businesses.

99.     Generally, the Debtors obtain the Insurance Policies through arrangements with Arthur J. Gallagher Risk Management Services, Inc. ("Gallagher") and Marsh McLennan ("Marsh," and together with Gallagher, the "Insurance Service Providers"). The Debtors have procured the Insurance Policies through several different insurers (collective, the "Insurers").

100.    The Insurance Policies generally require the Debtors to pay premiums based upon fixed or variable annual rates established by the Insurers (collectively, the "Insurance Premiums") at the beginning of the applicable policy period and certain policies are paid in quarterly installment. The Insurance Premiums are typically billed directly by the Insurers to the Insurance Service Providers on or soon after a given insurance policy's period date, and are paid by the Debtors through the Insurance Service Providers. The Debtors pay the Insurance Premiums through lump sums on an annual basis or under quarterly installments. The Debtors paid approximately $2,291,727 on account of the Insurance Premiums for policy year 2023, which is inclusive of the fees owed to the Insurance Service Providers for their services, and anticipate upcoming installment payments in the aggregate amount of $70,000. In addition, the Debtors paid approximately $3.6 million for excess Directors & Officers liability tail insurance. The Debtors do not believe they owe any prepetition amounts related to the Insurance Policies.

101.    The Debtors maintain workers' compensation insurance as required by statute in each of the states and countries in which they operate, other than the two monopolistic states in which the Debtors operate.  Specifically, the Debtors maintain a workers' compensation policy with Tri-State Insurance Company of Minnesota (Berkley) ("Tri-State") and a UK Combined Liability policy (including workers' compensation) with Zurich Insurance Company PLC (together with Tri-State, the "Workers' Compensation Insurers") (collectively, the "Workers' Compensation Policies").  In addition to these policies, the Debtors contribute ratably to the two monopolistic state policies in which they operate.  The Debtors paid an annual premium for the Workers' Compensation Policies of approximately $59,021, inclusive of the fees owed to the Insurance Service Providers for their services, subject to fluctuations in the U.S. dollar-pound sterling exchange rate, the rates established by the Workers' Compensation Insurers and true-up audits at the end of the policy periods.  Upon the filing of a verified claim by an eligible employee, the Workers' Compensation Insurers generally pay the claims directly to the employee through the Workers' Compensation Policies.

102.    The Debtors have employed the Insurance Service Providers to help them procure, negotiate, and evaluate the Insurance Policies and process claims related thereto.  Marsh provides services to the Debtors for all of its employee benefit insurance policies and Gallagher provides services to the Debtors for all other insurance policies.  The Insurance Service Providers are paid commissions on the Insurance Policies directly by the Insurers based on a predetermined percentage of premiums.  The Insurance Service Providers are familiar with the Debtors, their insurance needs, and the Insurance Policies.

103.    In sum, I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; (b) is

necessary to provide the Debtors with a reasonable opportunity for a successful sale and reorganization; (c) is necessary to avoid immediate and irreparable harm; and (d) best serves the interests of the Debtors' stakeholders.

*Remainder of Page Intentionally Left Blank*

## **DECLARATION**

Pursuant to section 1746 of title 28 of the United States Code, I declare under penalty of

perjury that the foregoing is true and correct.

Dated: April 7, 2023

**Pear Therapeutics, Inc.**

By: _____
Christopher Guiffre
Chief Financial Officer & Chief Operating Officer


**Pear Therapeutics (US), Inc.**

By: _____
Christopher Guiffre
Chief Financial Officer & Chief Operating Officer